**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | |
|---|---|
| RICHARD W. FIELDS and JOANNA M. SHEPHERD,<br><br>Plaintiffs,<br><br>v.<br><br>KENNETH J. BOJARSKI *dba* INNOVATIVE CONCEPTS, INSURANCE AND FINANCIAL SERVICES;<br>SCOTT PATTON *aka* JEFFREY PATTON *aka* JEFFREY SCOTT PATTON;<br>STUART VAUGHN;<br>MONARCH FINANCIAL GROUP, INC. *dba* INSIGHT INVESTMENTS & INSURANCE; and<br>ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>Defendants. | Case No. 1:26-cv-254<br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs, Richard W. Fields and Joanna M. Shepherd, for their cause of action against the Defendants, respectfully state as follows:

**INTRODUCTION**

1. This lawsuit arises out of a classic fraudulent premium-financing life insurance scheme that typically is perpetrated upon high-net-worth individuals who are experienced and successful in their areas of business but know little or nothing about sophisticated life insurance planning. The sham insurance plan is a variation of the “free insurance” scam that has been around for decades. The victims of this scheme are convinced to borrow large sums of money to finance life insurance premiums purportedly to allow them to purchase high amounts of

insurance at an overall low cost, with the financing being repaid from growth in the cash value of the insurance policy or from the eventual death benefit. In the case of the instant scam, Plaintiffs posted millions of dollars in collateral to secure their premium loan, with the understanding that the collateral would be returned to them over time and that the loan would be repaid from the policy itself, either from the growth in its cash value or from its death benefit. In other words, the Plaintiffs were told they would pay essentially nothing for tens of millions of dollars in death benefit. By perpetrating this scheme, the insurers, brokers, and agents earn huge sums of money in premiums, commissions, and other compensation for selling excessive amounts of insurance. The insureds (the Plaintiffs in this case) end up with a bogus insurance plan that cannot function as promised, a huge loan that can never actually be repaid from the policy itself, and a plan whose costs are intentionally designed to escalate to the point that the policy lapses before any death occurs. Plaintiffs in this case are victims of this scheme and lost millions of dollars as a result of the Defendants' actions.

**THE PARTIES**

2. Plaintiffs Richard Fields and Joanna Shepherd are citizens and residents of the state of Georgia.

3. Defendant KENNETH J. BOJARSKI is a citizen and resident of the state of Pennsylvania. At all relevant times, he did business as INNOVATIVE CONCEPTS, INSURANCE AND FINANCIAL SERVICES, which is registered as a fictitious name with the Pennsylvania Department of State. Defendant BOJARSKI communicated with other Defendants in Chattanooga, Tennessee, by telephone, email, and (on information and belief) personal visits to Chattanooga regularly for a period of years to carry out this scheme that was centered through an insurance brokerage in Chattanooga.

4. Defendant SCOTT PATTON *aka* JEFFREY PATTON *aka* JEFFREY SCOTT PATTON is a citizen and resident of the state of Tennessee.

5. Defendant STUART VAUGHN is a citizen and resident of the state of Tennessee.

6. Defendant MONARCH FINANCIAL GROUP, INC. is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee.

7. Defendant ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA is a Minnesota insurance corporation with its principal place of business in Minnesota, but with ongoing sales in the Eastern District of Tennessee. ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA is licensed to do business in Tennessee by the Tennessee Department of Commerce and Insurance and sells life insurance policies through brokers in Tennessee, including the Tennessee broker Defendants named in this complaint.

8. Upon information and belief, at all relevant times, each of the Defendants acted in concert with one another and in furtherance of each other's interests.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over the non-resident Defendants in accordance with Tennessee's long-arm statutes, Tenn. Code Ann. § 20-2-214 and § 20-2-225, in that each non-resident Defendant transacted business within Tennessee and committed tortious acts and omissions within Tennessee in connection with the conduct giving rise to the claims alleged herein, which conduct was centered in and directed through an insurance brokerage

located in Chattanooga, Hamilton County, Tennessee, such that the exercise of personal jurisdiction over each non-resident Defendant comports with due process.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district, specifically in Hamilton County, Tennessee.

**THE LIFE INSURANCE CONSPIRACY**

12. At all times relevant hereto, Defendants SCOTT PATTON and STUART VAUGHN owned and operated Defendant MONARCH FINANCIAL GROUP, INC. ("MONARCH"), which held itself out as an insurance and financial planning business. At some point, the company began doing business under the fictitious name INSIGHT INVESTMENTS & INSURANCE.

13. At all times relevant hereto, Defendant KENNETH J. BOJARSKI was the owner and operator of, and did business as, INNOVATIVE CONCEPTS, INSURANCE AND FINANCIAL SERVICES, which held itself out as an insurance and financial planning business with an expertise in planning life insurance plans for high-net-worth individuals using premium financing.

14. At all times relevant hereto, ALLIANZ LIFE INSURANCE OF NORTH AMERICA ("ALLIANZ") was a life insurance company that sold life insurance in the Eastern District of Tennessee. On information and belief, ALLIANZ willingly and knowingly participated in the wrongful insurance scheme set forth herein and was a co-conspirator in the scheme to obtain the massive premiums that result from this kind of scheme.

15. Around 2016, Plaintiffs Richard Fields and Joanna M. Shepherd planned to get married. Richard, then around 60 years old, decided he wanted to purchase life insurance to

make sure Joanna would be cared for after he died. Neither of the Plaintiffs had any particular experience in life insurance or any knowledge of premium financing.

16. One of Richard's employees introduced him via email to an insurance broker. Richard told the insurance broker that he wanted as much life insurance as he could reasonably afford to protect Joanna should be predecease her. The broker introduced Richard to Defendants STUART VAUGHN and SCOTT PATTON, who co-owned Defendant MONARCH. PATTON responded by asking Richard to call him. Richard explained his goals and his financial circumstances.

17. Defendants VAUGHN and PATTON, through MONARCH, along with Defendant BOJARSKI (collectively, the "BROKER DEFENDANTS") agreed among themselves to sell the Plaintiffs a fraudulent insurance plan that would earn the BROKER DEFENDANTS millions of dollars in commissions and fees.

18. In furtherance of that conspiracy, the BROKER DEFENDANTS arranged to meet with the Plaintiffs in Atlanta on February 18, 2016. On information and belief, shortly before the meeting, the BROKER DEFENDANTS caused an email to be sent to the Plaintiffs that contained what was characterized as "a sample illustration showing a permanent-insurance financing concept." On information and belief, that document was prepared by one or more of the BROKER DEFENDANTS, who were copied on the email. That was the first mention of premium financing and it was so cryptic that neither of the Plaintiffs understood it.

19. In the life insurance business, the term "illustration" has a specific meaning and it is a specific kind of document. The document emailed to the Plaintiffs on February 18, 2016, was not an "illustration" as that term is used in the industry. A proper illustration is typically 20 to 45 pages long and contains lengthy explanations providing projections for insurance policy

future performance under various scenarios. The industry has guidelines for how an illustration must be prepared and what it must contain. In contrast, the document emailed to the Plaintiffs was entitled "Confidential Financial Analysis Finance Insurance Program for SAMPLE CLIENT-M55 November 13, 2015." The document did not have any of Richard's actual financial or other information included in it but was a generalized *pro forma* document that consisted of four pages of tables with long columns of dollar amounts that had no meaning for either Richard or Joanna. They had no context and no way to know what the tables of numbers meant.

20. In furtherance of the conspiracy, on the following day, the BROKER DEFENDANTS met with Richard and Joanna. Each of the BROKER DEFENDANTS introduced themselves as experts in financial planning, including life insurance planning that includes premium financing. BOJARSKI emphasized his vast experience as an expert in premium financing. BOJARSKI told Plaintiffs that by purchasing life insurance with premium financing, they could afford more insurance than if they just paid the premiums in cash. The Plaintiffs told the defendants that neither of them were familiar with the concept of financing life insurance premiums and did not know it existed until that meeting.

21. During the meeting, the BROKER DEFENDANTS went through Richard and Joanna's current life insurance circumstances in detail. Defendants learned that Richard already had a ten-million-dollar life insurance policy from his former business. In other words, he already had ten million dollars in life insurance coverage that could be converted to permanent insurance to benefit Joanna should he predecease her.

22. In the meeting, BOJARSKI discussed the premium financing, with each of the other Defendants indicating their agreement with his points. He told the Plaintiffs that their best

option would be to use premium financing to fund more than a million dollars of premiums per year to purchase $15 million in additional life insurance. He specifically informed Richard and Joanna that:

a. This option would allow them to purchase more life insurance without actually having to pay for it, as their collateral would eventually be returned to them;

b. The life insurance policy they selected was an indexed universal life policy ("IUL") which, BOJARSKI said, was like investing in an index fund in the stock market because its value would grow with the market index, and he stated that the market index always grows at a very favorable rate over time, such that the policy offered not only a death benefit but also cash accumulation in the policy itself;

c. They would need to post collateral for the premium loan each year for up to the first five years, but after the first year, the amount of additional collateral that had to be posted would be very low, and that beginning in year six, the collateral would begin to be returned to them over time because the growth in cash value in the policy would be sufficient collateral to secure the loan;

d. The premium-finance loan would eventually be repaid from growth in the accumulated cash value of the insurance policy or, should Richard die early, from the death benefit of the policy itself, with plenty left over to pay a death benefit to Joanna;

e. Because the loan was backed by the insurance policy whose cash value would grow to cover repayment of the loan, there was no risk of losing their collateral.

23. In reality, the plan the BROKER DEFENDANTS proposed was unworkable and inappropriate for Richard and Joanna, and each of the BROKER DEFENDANTS knew that at the time. Despite that knowledge, these defendants collectively devised this plan and conspired to sell it to the Plaintiffs because the insurance policies the BROKER DEFENDANTS selected generated much higher commissions and other compensation for the BROKER DEFENDANTS than policies that would properly serve the Plaintiffs. By using the fraudulent premium-financing scheme, the brokers were able to convince the Plaintiffs to purchase much more insurance than they could actually afford or would need under a proper workable plan. Through the fraudulent scheme, the BROKER DEFENDANTS stood to receive many times the amount of commissions and other compensation they would earn from selling an appropriate plan.

24. The representations set forth above, which were made by BOJARSKI and assented to by the other BROKER DEFENDANTS, were both false and highly misleading. The defendants knew the representations were misleading and false, and they withheld from the Plaintiffs the further facts that needed to be disclosed to avoid misleading them.

25. Specifically, the defendants did not disclose any of the following material facts:

a. The BROKER DEFENDANTS were collecting a much higher commission, by many multiples, on this kind of premium-finance plan than they would earn by selling insurance without premium financing and using more appropriate types of insurance policies for Plaintiffs.

b. This premium-financing insurance plan is extremely high risk and extremely unlikely if not entirely unable to ever provide the results discussed in the sales meeting, and the vast majority of these plans fail. Performance of this kind of insurance depends upon a number of speculative factors over which Plaintiffs have no control, including the interest rate on a variable interest rate loan, the cost of insurance (which is a component of the premium), escalating collateral requirements, and the investment performance of the indexed universal life insurance. Over a period of decades, all of these factors must perform very favorably to Plaintiffs for the plan to work. In reality, real-world performance is almost certain to cause the plan to collapse either because of the excessive burden on the insured of maintaining the collateral or because the math simply does not work out as promised by the brokers, so the insured eventually finds the policy "underwater," meaning the insured is paying more in financing costs than the policy can generate as a death benefit.

c. Over time, as the cost of insurance increases on the indexed universal life insurance policies, the policies will perform worse because either the premiums will increase or the growth in the cash value of the policies will decrease.

d. The premium financing selected by the Defendants is much more sensitive to interest rate increases than an ordinary loan, because the principal increases substantially each year by the amount of the new premium. In an increasing-interest-rate environment, the amount of collateral required to secure the ever-growing loan can increase exponentially.

e. The indexed universal life insurance selected by the Defendants almost never performs as illustrated and rarely builds sufficient cash value to reduce the collateral requirement in the manner represented. Rather, annual collateral calls typically get much higher than represented.

f. Even after the premiums for the policy are fully paid, Plaintiffs will be required to renew their loan each year at its full balance unless they repay the loan, renewal is not guaranteed, and Plaintiffs will have to post additional collateral each year to cover escalating interest from the now enormous loan of more than $9.5 million plus interest.

g. Premium financing is not intended to be used where the exit strategy on the loan is repayment from growth in cash value of the policy or from the death benefit. These are not viable exit strategies because they are highly speculative and high-risk. The only proper uses of premium financing are where the insured is expecting a liquidation event in the short term, such as the sale of a business or real property, substantial inheritance, or some other event that provides a source of repayment of the loan. Death is not an exit strategy for repaying the loan.

h. This type of insurance plan, where the only exit strategy is either paying the loan from growth in the cash value of the policy or from the death benefit itself, usually fails.

26. The BROKER DEFENDANTS knew all of these facts but did not disclose any of them to the Plaintiffs, who had no experience in this kind of insurance. Without disclosure of

these material facts, the representations made by BOJARSKI and assented to by the other BROKER DEFENDANTS in the meeting were materially misleading or false.

27. In furtherance of the conspiracy and in order to sell the policy to the Plaintiffs, over the next months, the BROKER DEFENDANTS presented charts they called illustrations that showed the Plaintiffs only adding collateral for the first five years (starting to be released in year six), with relatively small increases after the first year, and then starting to get their collateral back in year six. In reality, this kind of performance is extremely unlikely, verging on impossible, under these plans and it was deceptive to present such rosy and unrealistic scenarios even with the disclaimer that this performance is not guaranteed. The BROKER DEFENDANTS never disclosed that not only is the performance not guaranteed, but it is completely unrealistic and almost certain not to perform this way, that the burden of carrying this insurance is substantially higher if the policy and the loan do not perform as illustrated, and that the math quickly gets turned upside-down so that the death benefit may not even cover the premium loan. The BROKER DEFENDANTS also did not disclose that these unfavorable scenarios are by far the most likely scenarios under this kind of plan and that the scenarios they portrayed are highly speculative, depend upon many factors to align very favorably over decades of time, and almost never happen as promised.

28. The BROKER DEFENDANTS represented themselves as experts in this kind of insurance plan, and they designed the insurance plan by selecting the type of insurance for Plaintiffs, the method of paying the premium (premium financing), and all aspects of the plan. Richard and Joanna did not select the kind of insurance, the amounts of insurance, or the method of funding the premiums. In fact, they had never heard of premium financing until the BROKER DEFENDANTS recommended it.

29. The plan created by the BROKER DEFENDANTS is nothing Richard and Joanna could have ever designed for themselves and nothing they requested. Rather, they agreed to the plan because these defendants held themselves out as experts and recommended the plan to the Plaintiffs as being the Plaintiffs' best option and one designed to reach their goals. The BROKER DEFENDANTS knew this was not true when they designed the plan, presented it to the Plaintiffs in the sales meeting, and failed to disclose the important truth about this kind of plan.

30. Plaintiffs were not interested in purchasing more insurance than they could afford nor investing in a flawed and highly speculative insurance plan. They would not have purchased the subject insurance had the material facts been disclosed, including the highly speculative and high-risk nature of the plan and the fact that this kind of plan usually fails.

31. Neither the Plaintiffs nor any other rational person would have entered into this insurance transaction if the BROKER DEFENDANTS had disclosed the true risks, the highly speculative nature of the transaction, and the extremely low probability of success.

32. In recommending this plan, the BROKER DEFENDANTS understood that the Plaintiffs lacked the experience or knowledge to independently evaluate the plan and were relying on the BROKER DEFENDANTS as experts.

**THE LAWYER REFERRAL**

33. Understanding that Richard and Joanna knew very little about life insurance and nothing at all about premium financing, the BROKER DEFENDANTS referred Richard and Joanna to a California attorney, Mark Ziebold, and his law firm Ziebold Law Group, P.C. The insurance transaction had no connection to California other than Ziebold, the Plaintiffs had no connection to California, and Ziebold was not authorized to practice law in Georgia, where

Plaintiffs resided and still reside, or in Tennessee, where the Defendants resided or conducted most of the acts giving rise to this cause of action. As such, the conduct of Ziebold and Ziebold Law Group, P.C. of representing Georgia residents in a Tennessee transaction constituted the unauthorized practice of law.

34. Ziebold held himself out as *specializing* in representing people like the Plaintiffs in premium-financed insurance transactions. In addition to preparing documents for these transactions, Ziebold held himself out as a consultant on these types of transactions and promised to "zealously" represent Richard and Joanna in the transaction.

35. In reality, Ziebold received substantial referrals from the BROKER DEFENDANTS and rubber-stamped their plans uncritically in order to continue receiving these referrals. On information and belief, Ziebold regularly assisted the BROKER DEFENDANTS in planning and peddling these plans. Ziebold had a material, undisclosed conflict of interest in this regard and did not disclose that conflict to Plaintiffs. Ziebold was not interested in scrutinizing this insurance plan and did not do so, even though he led Plaintiffs to believe he was looking after their interests in that regard.

36. Because the BROKER DEFENDANTS referred Plaintiffs to an attorney that was essentially their co-conspirator, Plaintiffs were lulled into not seeking other independent advice to scrutinize the plan. Plaintiffs believed they had an independent attorney looking out for their interests, though they did not. The BROKER DEFENDANTS knew Ziebold would not scrutinize the transaction and would rubber-stamp it for them. They also knew the Plaintiffs did not know and would not suspect this.

## ALLIANZ JOINS THE FRAUDULENT CONSPIRACY

37. Life insurance carriers in general and ALLIANZ LIFE INSURANCE OF NORTH AMERICA ("ALLIANZ") in particular provide extra scrutiny to high-value premium-financed transactions. They provide this extra scrutiny primarily to ensure their own regulatory compliance. As part of carrying out that function, all carriers have internal guidelines and reviews to alert them to a premium financed transaction that may involve fraud on the insured.

38. While each insurance carrier's individual process is maintained confidentially, all of them, including ALLIANZ's, involve the same overall framework. With respect to discovering potential fraud on the insured, life insurance carriers typically conduct the following specific reviews, among others:

a. Heightened financial scrutiny of the insured's finances to determine whether the insured can reasonably carry the long-term burden of the insurance;

b. Examination of the entire transaction for indications of a "free insurance" scam (of which the scheme described herein is variation), where the insured is given the impression that the insurance will cost them nothing and will be paid out of the cash value of the insurance;

c. Review of the premium financing including the identity of the lender and the terms of the financing, to determine if the financing is suitable and to determine the success rate of previous plans financed by that lender, including determining the number of lapsed policies and complaints from the insureds using that lender; and

d. Review of the agent/brokers' history of premium-financed transactions, including a determination of what percentage of premium-financed

transactions lapsed or otherwise failed and complaints related to the premium-financed plans they have put together.

39. On information and belief, ALLIANZ did scrutinize the Plaintiffs' transaction and such scrutiny informed ALLIANZ that the transaction was unsuitable for the Plaintiffs and was the product of misrepresentation or material omissions of facts.

40. Notwithstanding that knowledge, ALLIANZ elected to join the conspiracy as a co-conspirator and earn the enormous premiums that such plans generate, including over $1.2 million per year in premiums. In furtherance of the plan, ALLIANZ did all the foregoing acts:

a. issued misleading insurance illustrations to induce Plaintiffs to purchase the insurance,
b. sold insurance they knew was procured through misrepresentation, and
c. collected many millions of dollars in premiums before the plan collapsed.

41. As a direct act in furtherance of the conspiracy, in January of 2017, ALLIANZ issued policy illustrations as an aid to the BROKER DEFENDANTS in selling the policies. These policy illustrations were dense, impossible to understand by anyone who is not trained to understand life insurance illustrations, and highly misleading. Moreover, they were provided to the BROKER DEFENDANTS who controlled the manner in which they were presented, so they served no purpose other than as a tool to mislead the Plaintiffs in furtherance of the conspiracy.

42. On or about March 21, 2017, the Plaintiffs closed on the premium loan and ALLIANZ issued policy number 60093537 in the amount of $9,000,000 with a term rider in the amount of $6,000,000, for a total of $15,000,000 in life insurance. In exchange for issuing the policy, ALLIANZ received an initial annual premium of $1,215,750.37. The premium was paid by the lender.

43. The Plaintiffs borrowed money from other sources and deposited collateral of around $850,000 with the lender to secure the loan and also pledged the policy itself as additional collateral. In other words, if they did not repay the loan, Richard and Joanna would lose their collateral and the policy itself. Although they did not know it, they had now committed to an insurance plan that was destined to fail and they had no way out except to lose millions of dollars.

**THE CONTINUING FRAUD**

44. After the Plaintiffs entered into the transaction, they were required to renew the loan each year with the additional premium and to pay the difference between the cash value of the policy plus the previously pledged collateral and the full amount of the loan with interest for the upcoming year.

45. Each year when the renewal came up, Richard and Joanna inquired about the performance of the plan and about the amount of collateral.

46. Each year, BOJARSKI and sometimes other defendants responded by assuring Richard and Joanna that the plan was on track to succeed, even though the defendants knew that the plan was not on track, was heading away from the promised results, and was not likely to achieve anything remotely resembling the projections. The BROKER DEFENDANTS made these false statements to induce Richard and Joanna to enter into the new loan for the new year's premium and to post additional collateral to secure the loan.

47. Some years, the amount of additional collateral was higher than Richard and Joanna expected, but not so much higher that it caused Richard or Joanna to inquire about whether the entire plan was faulty in its basic design such that it would not provide the ultimate results promised (i.e., that collateral would start being returned after five years, that the policy

would be repaid from growth in cash value, and that Joanna would obtain a substantial death benefit to support her should Richard predecease her).

48. Instead, Richard and Joanna inquired about why the collateral was higher than projected, and BOJARSKI provided an excuse that purportedly was a one-time event and assured Richard and Joanna that the returns were in line with his expectations and everything was fine. Some years BOJARSKI provided outside backup to demonstrate that the returns were sufficient to support the plan.

49. For example, in 2018, when Plaintiffs inquired about the amount of additional collateral required, BOJARSKI explained that he used the wrong illustration in one meeting but pointed to other the illustrations that showed roughly that amount of collateral. Richard and Joanna accepted that explanation, posted the additional collateral, and entered into the new loan.

50. Similarly, in 2019, when the Plaintiffs inquired about a higher than expected additional collateral requirement, BOJARSKI again assured them the plan was functioning fine and that the higher collateral was a function of lower cash accumulation on the policy because of an anomaly in the S&P 500 that significantly underperformed is historical average and should not happen again. He also said that Richard had selected the wrong allocation of the investment funds, and that had contributed to the underperformance. Until then, the Plaintiffs did not know they had a choice of allocations. On BOJARSKI's advice, they then selected a different allocation of funds. BOJARSKI also advised them they could skip that year's new premium and pay less additional collateral to maintain the loan, then pay the skipped premium later. He provided new illustrations issued by ALLIANZ that he explained showed the plan was still on track and, other than requiring the premium to be paid later, would not materially affect the plan. The representation that the plan was functioning well and would reach the intended goal was

false and BOJARSKI knew it was false. He made the false representation to induce Plaintiffs to renew their loan and post the additional collateral so he would continue to earn commissions and any other compensation from the sale of the policy.

51. In 2020, when loan renewal came up again, Richard and Joanna inquired about the higher than expected additional collateral call, and BOJARSKI again assured them the plan was functioning as it should and attributed the higher-than-anticipated collateral call to the economic impact of COVID, which had just shut down the entire country. Again, Richard and Joanna accepted that as a reasonable explanation and posted the additional collateral. Once again, the representation that the plan was functioning well was false in that the plan was not functioning and would not be able to deliver as promised. BOJARSKI knew the representation was false. He made the false representation to induce Plaintiffs to renew their loan and post the additional collateral so he would continue to earn commissions and any other compensation from the sale of the policy.

52. Each year thereafter through 2025, at renewal time, Richard and Joanna inquired about the performance of the policy and the reason for the amount of additional collateral required. Each time, BOJARSKI falsely informed them that the policy was performing within expectations and provided an explanation for the amount of the additional collateral required and sometimes advised that they could skip another premium to reduce the amount of additional collateral to be posted. When he advised skipping a premium, ALLIANZ provided new misleading "illustrations" to support the claim that the plan would still perform as promised.

53. ALLIANZ issued the misleading illustrations to induce Plaintiffs to continue to borrow money to pay the next year's premiums.

54. BOJARSKI made these false statements in order to induce Plaintiffs to borrow more funds and post the additional collateral in order for the BROKER DEFENDANTS to continue earning commissions and other compensation.

55. The BROKER DEFENDANTS were aware of BOJARSKI's false statements and did not correct them and did not inform Plaintiffs of the falsity of these statements. Each of the false statements was made in furtherance of the conspiracy to defraud plaintiffs into entering into the plan and taking out a new loan each year to increase the premiums, commissions, and other compensation the BROKER DEFENDANTS would earn off the plan.

56. Because the burden of posting additional collateral year after year was taking a toll on Plaintiffs, in November of 2025, Richard and Joanna sought an outside opinion on how they might make the plan more economical. To do this, they had a different financial planner analyze the plan and advise them. Until that time, they did not suspect the entire plan sold to them by the BROKER DEFENDANTS was a fraudulent scheme that would fail. What they learned from the review by the new financial planner shocked them. They learned all of the following:

a. Under the plan as designed and implemented by the Defendants, it was virtually impossible for Plaintiffs to obtain the result promised.

b. Under almost all scenarios, the insurance would lapse unless Richard died young or the Plaintiffs began paying premiums again later, long after the policy was supposed to be paid in full, which would require either an enormous additional cash investment or require Plaintiffs to finance the new premiums, which included all of the new costs and additional collateral attendant with that new financing.

c. Under most scenarios and all likely scenarios, by the time Richard died (unless he died young), the loan plus interest repayment would consume all or most of the death benefit and under some likely scenarios, the cash value and death benefit of the policy would be insufficient to pay off the loan balance, leaving the Plaintiffs in debt rather than receiving a death benefit.

57. The viability of the insurance plan sold to the Plaintiffs depended upon exceptionally favorable and unlikely performance of the policy's investment component over decades, as well as favorable interest rates on the loan (which had variable interest rates). Over twenty to thirty years (Richard's reasonable life expectancy at the time the defendants sold the Plaintiffs the policy), it would be virtually impossible to achieve the level of consistently strong investment performance and favorable interest rates necessary for the insurance plan to succeed. The consequences of this not happening are that the plan fails and the policy either lapses or the Plaintiffs pay much more to keep it in force—essentially throwing good money after bad, because neither the cash value nor the death benefit would cover such additional expenditures. Had this truth been disclosed to Plaintiffs before they entered into the plan, they never would have entered into this fraudulent scheme. Had they not been lied to each year by the Defendants, they would not have continued to take out new loans, adding more than $1.2 million plus interest to the loan balance each year. Instead, they were told the opposite: that under all likely scenarios, they would earn enormous death benefits from the premium-finance plan—much more than they could earn from paying merely the amount of premiums they could afford without loan financing, and that the insurance plan was performing sufficiently to reach these goals.

58. At no time since the plan was sold to the Plaintiffs did any of the Defendants inform the Plaintiffs that the plan was very unlikely to perform as promised, that there was a

significant risk they would end up in debt at the end of this process rather than obtaining a substantial death benefit for Joanna, or that the insurance plan was badly off track by November of 2025. They only discovered this when they inquired of a different financial planner about these issues, namely inquiring whether there was a way to continue to support the plan while reducing the annual collateral commitment.

**PLAINTIFFS TERMINATE THE PLAN AND SUFFER MASSIVE LOSSES**

59. Upon learning that the plan could not work, the Plaintiffs were left with a difficult dilemma. They owed the lender approximately $9,554,574 on the loan, which was far more than the cash value in the policy and even more than the cash value on the policy plus the collateral held by the lender. But borrowing additional money to sustain the policy was not viable because the plan would never achieve its goal and was most likely to end up leaving Plaintiffs in even more debt in the future if they continued, and they would suffer an even greater loss. Based upon what they learned, the policy was likely to be underwater by the time of any death benefit.

60. At that point, the Plaintiffs searched for alternatives to mitigate their damage. They explored refinancing the loan and/or replacing the insurance with other policies, among other possibilities, but concluded that they could not do any of these things. Their best option was to surrender the policies and pay off the loans at a substantial loss.

61. At that point, the Plaintiffs worked with the lender to surrender the policy and apply the cash value to pay down the loan balance, surrendered the collateral to pay down the loan balance further, and paid the lender in cash for the balance. That was the least damaging of all available alternatives.

62. As a result of surrendering the policy and paying off the loan, Richard and Joanna lost $3,550,523.10 in collateral, $5,500,636.93 in surrender value of the policy, and $660,000 in

cash paid to satisfy the loan balance. In addition, Richard is no longer insurable with a replacement policy, so he cannot replace the lost insurance with new insurance and has permanently lost the value of the death benefit. Had the Defendants sold the Plaintiffs a feasible insurance plan using proper insurance, Richard would have had a reasonable death benefit from that additional insurance.

63. This lawsuit seeks to recover those losses from those responsible.

**COUNT 1**

**(Intentional Misrepresentation / Fraud — Against the BROKER DEFENDANTS)**

64. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

65. This claim is asserted against Defendants KENNETH J. BOJARSKI *dba* INNOVATIVE CONCEPTS, INSURANCE AND FINANCIAL SERVICES, SCOTT PATTON, STUART VAUGHN, and MONARCH FINANCIAL GROUP, INC. (collectively, the "**BROKER DEFENDANTS**"), and is pleaded both as a fraud at the inception of the transaction and as a continuing fraud.

66. At the meeting in Atlanta, Georgia, on February 18, 2016, the BROKER DEFENDANTS made the affirmative representations to Plaintiffs set forth above, including, in substance, that: (a) the premium-financed plan would allow Plaintiffs to acquire $15 million in additional life insurance without ultimately paying for it because Plaintiffs' collateral would be returned to them; (b) the selected indexed universal life policy was like an investment in a market index that always grows at a very favorable rate over time and would generate cash accumulation; (c) the required collateral would be minimal after the first year and would be returned to Plaintiffs over time as the policy's cash value grew; (d) the loan would be repaid

from the policy's cash value or, upon Richard's death, from the death benefit, with a substantial benefit remaining for Joanna; and (e) there was no risk of losing their collateral.

67. Each of the foregoing representations was a representation of then-existing and material fact concerning the nature, design, suitability, and characteristics of the plan and the policy as of the time the representations were made, and concerning the BROKER DEFENDANTS' contemporaneous recommendation that the plan was Plaintiffs' best option and was designed to achieve Plaintiffs' stated goals. To the extent any representation concerned future performance, it carried an implied representation of then-existing fact that the BROKER DEFENDANTS had a reasonable basis for the representation and knew of no facts rendering it false or misleading, and such implied representation was itself false.

68. Each representation was false or materially misleading when made. In truth, the plan was unworkable and unsuitable for Plaintiffs; the indexed universal life policy was highly unlikely ever to perform as represented; the plan was highly unlikely to generate sufficient growth of the cash value in the policy to return collateral before Richard's death; the policy was highly unlikely to ever generate sufficient cash growth to fully repay the loan; and Plaintiffs' collateral and the policy itself were at substantial risk of total loss.

69. The BROKER DEFENDANTS held themselves out to Plaintiffs as experts in life insurance and premium financing, designed the entire plan, selected the policy and the financing method, and recommended the plan to Plaintiffs as being in Plaintiffs' best interest, while knowing that Plaintiffs lacked the experience and knowledge to evaluate the plan independently and were reposing trust and confidence in the BROKER DEFENDANTS' expertise. By reason of that relationship, of the BROKER DEFENDANTS' superior and exclusive knowledge of material facts not reasonably available to Plaintiffs, and of the BROKER DEFENDANTS'

materially incomplete disclosures that created a false and misleading impression, the BROKER DEFENDANTS owed Plaintiffs a duty to disclose the material facts set forth above that would have rendered their statements not fraudulent.

70. In breach of that duty, the BROKER DEFENDANTS concealed and failed to disclose the material facts set forth above including, among others, that: the BROKER DEFENDANTS would earn commissions and compensation many multiples higher on the premium-financed plan than on a suitable plan; the plan was extremely high risk and the vast majority of such plans fail; the indexed universal life policy almost never performs as illustrated; the premium financing was acutely sensitive to interest-rate increases; even after the premium-paying period Plaintiffs would be required to renew the loan annually and post escalating collateral against a loan exceeding $11 million; and repayment from policy cash value or the death benefit is not a viable exit strategy.

71. The misrepresented and concealed facts were material. Neither Plaintiffs nor any reasonable person in their position would have entered into the transaction had the true facts been disclosed.

72. The BROKER DEFENDANTS knew that each representation was false or materially misleading when made, and knew of the undisclosed material facts, or made the representations recklessly and without belief in their truth. The BROKER DEFENDANTS possessed this knowledge by reason of their professed and actual expertise in premium-financed life insurance and their design of the plan.

73. The BROKER DEFENDANTS made the misrepresentations and concealed the material facts with the intent to induce Plaintiffs to purchase the plan and the policy and thereby

to generate the substantial commissions and compensation the plan would yield for the BROKER DEFENDANTS.

74. Plaintiffs justifiably and reasonably relied upon the BROKER DEFENDANTS' representations and upon the BROKER DEFENDANTS' silence as to the concealed material facts. Plaintiffs' reliance was reasonable in light of their lack of any experience in life insurance or premium financing, the BROKER DEFENDANTS' holding themselves out as experts in those areas, and the BROKER DEFENDANTS' design and recommendation of the plan as being in Plaintiffs' best interest. In reliance, Plaintiffs purchased the plan, closed on the loan on or about March 21, 2017, posted approximately $850,000 in collateral, and pledged the policy as additional collateral.

75. The BROKER DEFENDANTS' fraud did not terminate at the inception of the transaction but continued each year from 2018 through 2025. At each annual loan renewal, when Plaintiffs inquired about the policy's performance and the escalating collateral calls, Defendant BOJARSKI, with the knowledge and acquiescence of the other BROKER DEFENDANTS, falsely represented that the plan was performing within expectations and remained on track to achieve the promised results, and attributed each shortfall to a discrete, non-recurring cause, including, in 2018, the asserted use of a "wrong illustration"; in 2019, an asserted anomaly in the performance of the S&P 500 and an asserted error in Plaintiffs' fund allocation; and in 2020, the asserted economic impact of the COVID-19 pandemic. Each such representation was false when made and was known by BOJARSKI to be false, because the plan was not performing as represented and was structurally incapable of achieving the promised results.

76. The BROKER DEFENDANTS made each annual representation with the intent to induce Plaintiffs to renew the loan, to borrow the next year's premium of more than $1.2

million, and to post additional collateral, with the result that the BROKER DEFENDANTS would continue earning commissions and compensation. Plaintiffs justifiably relied upon each annual misrepresentation and, in reliance, renewed the loan each year, borrowed each successive premium, and posted additional collateral, sustaining additional and increasing losses each year.

77. As a direct and proximate result of the BROKER DEFENDANTS' fraud, both at inception and as continued through 2025, Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of their pledged collateral, the lost surrender value of the policy, the cash paid to satisfy the loan balance upon surrender, and damages flowing from Richard Fields' resulting uninsurability, together with consequential damages.

78. The BROKER DEFENDANTS' conduct was intentional, fraudulent, malicious, and/or reckless, entitling Plaintiffs to an award of punitive damages.

**COUNT 2**

**(Intentional Misrepresentation / Fraud — Against Defendant ALLIANZ)**

79. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

80. This claim is asserted against Defendant ALLIANZ Life Insurance Company of North America ("ALLIANZ").

81. In January 2017, and again in subsequent years when Plaintiffs were advised to skip a premium, ALLIANZ issued life insurance policy illustrations concerning policy number 60093537 and the premium-financed plan. The illustrations projected favorable performance of the indexed universal life policy and depicted the plan as capable of performing as the BROKER DEFENDANTS had represented—namely, that Plaintiffs would post collateral which would

start to be returned after five years, and that the loan would be repaid from the policy with a substantial death benefit remaining.

82. The illustrations were false and materially misleading. They projected and depicted favorable performance scenarios that were, in truth, highly unrealistic and almost certain not to occur over the life of the plan, while omitting that such performance was speculative in the extreme and that the plan was overwhelmingly likely to fail. The illustrations were dense and not understandable by any person not trained to read life insurance illustrations, and ALLIANZ issued them to and through the BROKER DEFENDANTS, who controlled the manner of their presentation, so that the illustrations functioned not as a fair disclosure of the policy's likely performance but as an instrument to induce and sustain the Plaintiffs' payment of premiums with borrowed money.

83. The matters misrepresented and omitted in the ALLIANZ illustrations were material to Plaintiffs' decision to purchase and to maintain the plan.

84. ALLIANZ knew that the illustrations were false and materially misleading when it issued them. As alleged above, ALLIANZ applies heightened scrutiny to high-value premium-financed transactions and scrutinized this transaction, and that scrutiny informed ALLIANZ that the transaction was unsuitable for Plaintiffs and was the product of misrepresentation or the omission of material facts. ALLIANZ nonetheless issued the illustrations to facilitate the sale and to obtain the premiums the plan would generate, exceeding $1.2 million per year.

85. ALLIANZ issued the illustrations with the intent and reasonable expectation that they would be communicated to, presented to, and relied upon by Plaintiffs through the BROKER DEFENDANTS, both in deciding to purchase the policy and, in later years, in

deciding to continue borrowing to pay premiums and to post additional collateral. ALLIANZ intended the illustrations to induce that conduct.

86. Plaintiffs justifiably relied upon the ALLIANZ illustrations as presented to them by the BROKER DEFENDANTS in purchasing the policy and in renewing the loan and posting collateral in successive years.

87. As a direct and proximate result of ALLIANZ's conduct, Plaintiffs have suffered damages in an amount to be proven at trial, as set forth above.

88. ALLIANZ's conduct was intentional, fraudulent, malicious, and/or reckless, entitling Plaintiffs to an award of punitive damages.

**COUNT 3**

**(Civil Conspiracy to Defraud — Against all Defendants)**

89. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

90. This claim is asserted against all Defendants. It is derivative of and dependent upon the fraud alleged in Counts 1 and 2.

91. The BROKER DEFENDANTS and ALLIANZ are separate and legally distinct persons and entities, each possessing his/its own independent economic interest in the transactions induced by unlawful means, and each was at all relevant times legally capable of conspiring with the others.

92. The BROKER DEFENDANTS and ALLIANZ, and each of them, knowingly and willfully entered into a common design and agreement to defraud Plaintiffs by unlawfully inducing Plaintiffs to purchase and to maintain the unsuitable premium-financed plan through the misrepresentations and concealment alleged above, for the common purpose of generating

commissions, compensation, and premiums for the conspirators. Each conspirator knew of the unlawful, fraudulent object of the common design and agreed to participate in and to further it.

93. In furtherance of the conspiracy, the conspirators committed overt acts, including, among others: arranging and conducting the February 18, 2016, meeting with Plaintiffs; making the affirmative misrepresentations and concealing the material facts alleged above; preparing and presenting to Plaintiffs the misleading charts and "illustrations" used to sell the plan; the BROKER DEFENDANTS' referral of Plaintiffs to an attorney whom the BROKER DEFENDANTS knew would not scrutinize the transaction and would uncritically endorse it, in order to lull Plaintiffs into foregoing independent advice; ALLIANZ's issuance of the misleading illustrations and its approval and issuance of the policy notwithstanding its knowledge that the transaction was unsuitable and procured by misrepresentation; and the BROKER DEFENDANTS' annual misrepresentations from 2018 through 2025 to induce Plaintiffs to continue borrowing and to post additional collateral.

94. As a direct and proximate result of the conspiracy and of the overt acts committed in furtherance of it, Plaintiffs suffered the damages alleged above. Each conspirator is jointly and severally liable for all acts committed by any co-conspirator in furtherance of the conspiracy.

95. The conspirators' conduct was intentional, fraudulent, malicious, and/or reckless, entitling Plaintiffs to an award of punitive damages.

**COUNT 4**

**(Negligent Misrepresentation — Against all Defendants)**

96. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein. This claim is pleaded in the alternative to Counts 1, 2, and 3.

97. This claim is asserted against all Defendants.

98. Each Defendant supplied the information at issue in the course of its business, profession, or employment, and in a transaction in which the Defendant had a pecuniary interest—the BROKER DEFENDANTS in the form of commissions and other compensation, and ALLIANZ in the form of premiums.

99. The BROKER DEFENDANTS supplied false information for the guidance of Plaintiffs in a business transaction, namely the representations alleged above that induced the Plaintiffs to agree to the initial policy purchase, and the annual representations alleged above that induced the Plaintiffs to keep borrowing more money and posting more collateral to maintain the financially ruinous policy. ALLIANZ supplied false information for the guidance of Plaintiffs in the form of the misleading illustrations alleged above, intending and expecting that information to be communicated to and to guide Plaintiffs in the transactions.

100. Each Defendant failed to exercise reasonable care or competence in obtaining or communicating such information.

101. Plaintiffs justifiably relied upon the information supplied by each Defendant, as alleged above, and such reliance was reasonable in light of Plaintiffs' lack of experience and the Defendants' holding themselves out as possessing the relevant expertise.

102. As a direct and proximate result of each Defendant's negligent misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial, as set forth above.

## COUNT 5

## (Negligence — Against the BROKER DEFENDANTS)

103. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein. This claim is pleaded in the alternative to Counts 1, 2, 3, and 4.

104. This claim is asserted against the BROKER DEFENDANTS.

105. By holding themselves out to Plaintiffs as experts in life insurance and premium financing, by undertaking to design and to recommend an insurance and financing plan for Plaintiffs, and by doing so with knowledge that Plaintiffs lacked the knowledge and experience to evaluate the plan and were relying upon the BROKER DEFENDANTS' expertise, the BROKER DEFENDANTS assumed and owed Plaintiffs a duty to exercise the reasonable care, skill, and diligence ordinarily exercised by insurance and financial professionals possessing such expertise, including a duty to recommend a plan suitable for Plaintiffs and to disclose the material risks and characteristics of the plan they recommended.

106. The BROKER DEFENDANTS breached that duty by, among other things: designing and recommending a plan that was unsuitable for Plaintiffs; recommending excessive insurance funded through a financing structure they knew or should have known was likely to fail; failing to disclose the material risks and characteristics of the plan alleged above; and failing, in the years following the inception of the plan, to advise Plaintiffs of the plan's deterioration and its inability to achieve the promised results.

107. As a direct and proximate result of the BROKER DEFENDANTS' breaches, which were both the cause in fact and the legal/proximate cause of Plaintiffs' injuries, Plaintiffs have suffered damages in an amount to be proven at trial, as set forth above.

**COUNT 6**

**(Breach of Fiduciary Duty — Against the BROKER DEFENDANTS)**

108. Plaintiffs reallege and incorporate by reference each and every preceding paragraph of this Complaint as though fully set forth herein.

109. This claim is asserted against the BROKER DEFENDANTS.

110. By holding themselves out to Plaintiffs as experts and advisors in life insurance and premium financing, by undertaking to design and to recommend the insurance plan, and by inducing Plaintiffs to repose trust and confidence in them—which trust and confidence Plaintiffs did in fact repose—the BROKER DEFENDANTS entered into a confidential and fiduciary relationship with Plaintiffs.

111. That relationship imposed upon the BROKER DEFENDANTS fiduciary duties of loyalty, good faith, and full and candid disclosure of all material facts, and a duty to act in Plaintiffs' best interest and to place Plaintiffs' interests above their own.

112. The BROKER DEFENDANTS breached those duties by, among other things: placing their own financial interest in commissions and compensation above the interests of Plaintiffs; recommending an unsuitable plan that served the BROKER DEFENDANTS' financial interest rather than Plaintiffs' interest; failing to disclose the material facts alleged above, including the magnitude of the BROKER DEFENDANTS' compensation and the near-certain failure of the plan; referring Plaintiffs to an attorney the BROKER DEFENDANTS knew would not protect Plaintiffs' interests; and continuing to conceal the plan's failure in the years following its inception.

113. As a direct and proximate result of the BROKER DEFENDANTS' breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be proven at trial, as set forth above.

114. The BROKER DEFENDANTS' conduct was intentional, malicious, and/or reckless, entitling Plaintiffs to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a trial by jury on all issues so triable, and pray for judgment against Defendants, and each of them, jointly and severally, as follows:

1. For compensatory damages in an amount to be proven at trial;
2. For punitive damages on Counts 1, 2, 3, and 6;
3. For prejudgment and post judgment interest as allowed by law;
4. For the costs of this cause, including discretionary costs; and
5. For such other and further relief as the Court deems just and equitable.

Respectfully submitted,

QUANTUM LAW GROUP, LLP

Jonathan M. Deer (CA SBN 164837)
Steven A. Morris (CA SBN 126193)
8383 Wilshire Blvd, Ste 935
Beverly Hills CA 90211
Motion for Admission *Pro Hac Vice* Pending

DEGAETANO LAW FIRM

s/ Joseph G. DeGaetano
Joseph G. DeGaetano (B.P.R. No. 21448)
50 Frazier Avenue, Suite 300
Chattanooga, Tennessee 37405
(423) 255-7642
joe@jdfirm.com

*Attorneys for Plaintiffs*